**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**Case No.** _____

SHERYL WULTZ, individually, and as
personal representative of the Estate of
Daniel Wultz;

YEKUTIEL WULTZ, individually, and as
personal representative of the Estate of
Daniel Wultz;

and

AMANDA WULTZ,

PLAINTIFFS,

vs.

THE CENTRAL BANK OF THE ISLAMIC REPUBLIC OF IRAN A/K/A BANK MARKAZI
c/o The Ministry of Foreign Affairs for the Islamic Republic of Iran,
Imam Khomeini Avenue, Tehran, Iran;

THE NATIONAL IRANIAN TANKER CORPORATION
c/o The Ministry of Foreign Affairs for the Islamic Republic of Iran,
Imam Khomeini Avenue, Tehran, Iran;

THE NATIONAL IRANIAN OIL COMPANY
c/o The Ministry of Foreign Affairs for the Islamic Republic of Iran,
Imam Khomeini Avenue, Tehran, Iran;

THE NATIONAL IRANIAN GAS COMPANY
c/o The Ministry of Foreign Affairs for the Islamic Republic of Iran,
Imam Khomeini Avenue, Tehran, Iran;

THE NATIONAL IRANIAN PETROCHEMICAL COMPANY
c/o The Ministry of Foreign Affairs for the Islamic Republic of Iran,
Imam Khomeini Avenue, Tehran, Iran;

and

IRAN AIR
c/o The Ministry of Foreign Affairs for the Islamic Republic of Iran,
Imam Khomeini Avenue, Tehran, Iran,

DEFENDANTS.

## COMPLAINT

Plaintiffs, by counsel, complain of the Defendants and allege for their Complaint as follows:

## BACKGROUND

1.      On May 14, 2012, this Court entered a judgment in *Wultz et al. v. Islamic Republic of Iran et al.*, Case No. 08-cv-1460 (RCL) (D.D.C.) [DE 137][1] against two designated state sponsors of terror–the Islamic Republic of Iran ("Iran") and the Syrian Arab Republic ("Syria"), together with certain of their agencies and instrumentalities–and awarded Plaintiffs compensatory damages in the amount of $32,068,634 and punitive damages in the amount of $300,000,000.  It amended the judgment on June 4, 2012 ("Wultz Judgment").  A copy of the Wultz Judgment is attached hereto as Exhibit A.

2.      The Court entered the Wultz Judgment after a two-day evidentiary hearing, on February 27 and 29, 2012, during which it received evidence establishing that Iran, Syria, and their respective agencies and instrumentalities provided material support for a terrorist suicide bombing act carried out by the Palestinian Islamic Jihad ("PIJ") on April 17, 2006 in Tel Aviv, Israel.  The suicide bombing critically injured sixteen-year old Daniel Wultz, who subsequently died, and seriously injured his father, Tuly Wultz ("Terrorist Attack").  Memorandum and Opinion, dated May 14, 2012 ("Memorandum Opinion") [DE 134] at 13-18, a copy of which is attached as Exhibit B.

3.      Based on the evidence, the Court found that Iran and Syria violated 28 U.S.C. § 1605A(c) by providing "substantial logistical, financial, and technical support" to the PIJ in the period leading up to the Terrorist Attack.  Memorandum Opinion at 6.  The Court further found

---

[1] Unless otherwise noted, all docket entries refer to *Wultz et al. v. Islamic Republic of Iran et al.*, Case No. 08-cv-1460 (RCL) (D.D.C.).

that both were culpable "for the extrajudicial killing of a U.S. citizen, Daniel Wultz, and for the provision of material support to the members of PIJ participating in the bombing," *id*. at 13, and that both were liable for "Daniel and Tuly Wultz['s] suffer[ing] severe physical injury from the suicide bombing," *id*. at 16.

4.      In this Complaint, the Plaintiffs seek a declaratory judgment finding that any and all property belonging to the Defendants, each of which is an agent or instrumentality of Iran, is subject to attachment and execution in satisfaction of the Wultz Judgment pursuant to 28 U.S.C. § 1610(g).

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this matter and over the Defendants pursuant to 28 U.S.C. §§ 1330-1332, 1367, 1605A and 18 U.S.C. §§ 2333-2334.

## THE PARTIES

6.      Plaintiff Sheryl Wultz ("Sheryl") is, and at all times relevant to the allegations of this Complaint was, a United States citizen with her domicile in Florida.  Sheryl is the mother of Daniel Wultz, his heir, and the personal representative of the Estate of Daniel Wultz, who was murdered in the Terrorist Attack.  Sheryl brings this action individually and on behalf of the Estate of Daniel Wultz.

7.       Plaintiff Tuly Wultz ("Tuly") is, and at all times relevant to the allegations of this Complaint was, a United States citizen with his domicile in Florida.  Tuly is the father of Daniel Wultz.  Tuly was also severely injured in the Terrorist Attack.  Tuly brings this action individually and on behalf of the Estate of Daniel Wultz.

8.      Plaintiff Amanda Wultz ("Amanda") is a United States citizen with her domicile currently in New Mexico, and at the times relevant to the allegations of this Complaint was, a United States citizen with her domicile in Florida.  Amanda is the sister of Daniel Wultz.

9.      Defendant National Iranian Tanker Corporation ("NITC") is a corporation wholly owned by the government of Iran.  As a result, it is an "instrumentality" of Iran within the meaning of 28 U.S.C. § 1603(b) and § 1610(g) and its property is, therefore, subject to attachment and execution in satisfaction of the Wultz Judgment.  For a period of time, the United States designated NITC as a Specially Designated National[2] ("SDN") and imposed sanctions.

10.      Defendant National Iranian Oil Corporation ("NIOC") is a corporation wholly owned by the government of Iran.  As a result, it is an "instrumentality" of Iran within the meaning of 28 U.S.C. § 1603(b) and § 1610(g) and its property is, therefore, subject to attachment and execution in satisfaction of the Wultz Judgment. For a period of time, the United States designated NIOC as an SDN and imposed sanctions.

11.      Defendant Central Bank of the Islamic Republic of Iran, a/k/a Bank Markazi ("Markazi") is a joint stock company, whose capital is wholly owned by the government of Iran. Therefore, it is an "agency or instrumentality" of Iran within the meaning of 28 U.S.C. § 1603(b) and 28 U.S.C. § 1610(g).  Markazi also engages in substantial commercial activity.  As a consequence, its commercial and non-governmental property is, therefore, subject to attachment and execution in satisfaction of the Wultz Judgment.  For a period of time, the United States designated Bank Markazi as an SDN and imposed sanctions.

---

[2] A "Specially Designated National" is a person, entity, organization, or vessel that as been found by the United States government to present a threat to the national security, foreign policy, or economy of the U.S.  Assets belonging to an SDN are blocked and U.S. persons are generally prohibited from dealing with them.

12. Defendant National Iranian Gas Company ("NIGC") is a corporation wholly owned by the government of Iran. As a result, it is an "instrumentality" of Iran within the meaning of 28 U.S.C. § 1603(b) and 28 U.S.C. § 1610(g) and its property is, therefore, subject to attachment and execution in satisfaction of the Wultz Judgment.

13. Defendant National Iranian Petrochemical Company ("NIPC") is a corporation wholly owned by the government of Iran. As a result, it is an "instrumentality" of Iran within the meaning of 28 U.S.C. § 1603(b) and § 1610(g) and its property is, therefore, subject to attachment and execution in satisfaction of the Wultz Judgment. For a period of time, the United States designated NIPC as an SDN and imposed sanctions.

14. Defendant Iran Air is a corporation wholly owned by the government of Iran. As a result, it is an "instrumentality" of Iran within the meaning of 28 U.S.C. § 1603(b) and § 1610(g) and its property is, therefore, subject to attachment and execution in satisfaction of the Wultz Judgment. For a period of time, the United States designated Iran Air as an SDN and imposed sanctions.

## STATEMENT OF FACTS

### Iran is a Designated State-Sponsor of Terrorism

15. Iran is, and at all times relevant hereto was, a foreign state within the meaning of 28 U.S.C. § 1603, designated as a state sponsor of terrorism pursuant to section 6(j) of the Export Administration Act of 1979 (50 U.S.C. § 2405(j)). Memorandum Opinion at 6. Iran provided material support and resources for the Terrorist Attack in violation of 28 U.S.C. § 1605A. *Id*. Iran has for decades materially supported, and provided practical assistance to, a global network of terror, including by providing weapons, funding, and training to the PIJ. Iran's terror financing network, which includes the Defendants ("the Global Terror Network"),

has provided support for countless terror attacks in Israel and beyond, including the Terrorist

Attack that targeted Daniel Wultz and Tuly Wultz.  Iran provides an estimated $300 to $500

million to terrorist groups annually through the Global Terror Network.  Iran intentionally

provided practical assistance to the PIJ with the specific purpose of facilitating the PIJ's terrorist

attacks that kill or injure U.S. citizens, including the Terrorist Attack.

<u>The Palestine Islamic Jihad Is a Designated Foreign Terrorist Organization<br>and a Specially Designated Global Terrorist</u>

16.     The Palestine Islamic Jihad was formed in the Gaza Strip during the early 1980s.

17.     The PIJ is a radical terrorist organization that is supported, directly and indirectly,

by Iran and the Defendants.  The PIJ's openly-declared goal is the creation of an Islamic state in

the land of Israel, the West Bank and the Gaza Strip, and the destruction of the State of Israel and

the murder or expulsion of its Jewish residents (including U.S. citizens).  The PIJ seeks to

achieve this goal by carrying out terrorist attacks against civilians, including Americans, in

Israel, the West Bank and the Gaza Strip.  The PIJ proudly and openly acknowledges that it uses

terrorism to achieve its political goals.  The PIJ uses terrorism in an effort to coerce, intimidate,

and influence government decision-makers and the public in Israel to accept the PIJ's demands.

18.     Between the time of the PIJ's founding and April 17, 2006 (and until the present

day), the PIJ, with the direct and indirect support of Iran and Defendants, has carried out

thousands of terrorist attacks in Israel, the West Bank and the Gaza Strip, in which many U.S.

citizens were murdered and hundreds more wounded.

19.     Between the time of its founding and April 17, 2006, the PIJ's policy and practice

of carrying out terrorist attacks was, and is, notorious and well known to the public at large,

including the Defendants.

20.     Between 1999 and April 17, 2006, the courts of the United States, including this

Court, published a number of decisions finding that the PIJ was responsible for terrorist attacks in which U.S. and Israeli citizens were killed or injured.

21.    The PIJ has been designated by the United States as a Foreign Terrorist Organization ("FTO") continuously since 1997 and as a Specially Designated Global Terrorist ("SDGT") continuously since 2001.

Iran's Provision of Material Support and Resources to the PIJ

22.    Since 1984 until the present time, Iran has been continuously designated by the United States Department of State as a state sponsor of terrorism pursuant to Section 6(j) of the Export Administration Act of 1979 (50 U.S.C. § 2405(j)).

23.    Iran remains designated as a state sponsor of terrorism because, *among other things*, it provides material support and practical assistance to the PIJ with the purpose of facilitating the PIJ's terrorist attacks, including the Terrorist Attack. The United States government has repeatedly notified Iran that its provision of material support and practical assistance to the PIJ is a threat to the United States and its citizens, many of whom have been murdered or harmed by acts of terrorism carried out by the PIJ, and demanded—to no avail— that Iran cease its provision of material support and practical assistance to the PIJ.

24.    During the period relevant hereto, including the several years immediately preceding the Terrorist Attack, Iran and the Defendants directly and indirectly provided the PIJ with massive financial support and practical assistance with the specific intention of causing and facilitating the commission of acts of extrajudicial killing and personal injury in furtherance of international terrorism.  Such financial support and practical assistance was provided continuously, routinely, and in furtherance of a specific policy and practice established and maintained by Iran, to assist the PIJ in achieving goals shared by Iran.  These goals included

terrorizing the civilian population in Israel (including U.S. citizens), and weakening Israel's economy, social fabric, and military strength and preparedness.

25.     Iran's commission of acts of extrajudicial killing and Iran and Defendants' provision of material support and practical assistance for such killings was reasonably certain to—and indeed did—cause injury to the Plaintiffs.

26.     Iran provided this financial support and practical assistance to the PIJ pursuant to an agreement reached between Iran and the PIJ in the 1980s, which remains in force until this day.  Under that agreement, the PIJ undertook to carry out acts of extrajudicial killing, personal injury, and international terrorism against Jews in Israel, the West Bank and Gaza, and in return Iran undertook to provide the PIJ with financial support and practical assistance to carry out such extrajudicial killings, assaults, and batteries, including the Terrorist Attack.  The purpose of this agreement was to achieve the goals detailed in the preceding paragraphs.

27.     Iran and Defendants gave substantial aid, practical assistance, and encouragement to the PIJ, and provided massive financial support to the PIJ, and thereby aided and abetted the PIJ, with the specific intention of causing and facilitating the commission of acts of extrajudicial killing and international terrorism, including the Terrorist Attack.  Iran and Defendants did so with actual knowledge that the PIJ had killed and injured numerous U.S. citizens in terrorist attacks, with the criminal intent to participate in acts of international terrorism, and for the specific purpose of helping the PIJ, and other terrorist groups, to kill or injure U.S. citizens.

28.     Iran and Defendants knowingly and willingly conspired, agreed and acted in concert with the PIJ, in pursuance of a common criminal plan, design, agreement and goal to cause and facilitate the commission of acts of international terrorism, including extrajudicial killings like the Terrorist Attack.  Iran and Defendants did so with actual knowledge that the PIJ

had killed and injured numerous U.S. citizens in terrorist attacks, with the criminal intent to

participate in acts of international terrorism, and for the specific purpose of helping the PIJ, and

other terrorist groups, to kill or injure U.S. citizens and other innocent civilians.

Defendants' Provision of Material Support of Iran's Global Terror Network

Markazi Participated in Iran's Global Terror Network

29.     Markazi is, and at all times relevant hereto was, at the service of the Supreme

Leader of Iran, the Iranian Revolutionary Guard Corp. ("IRGC"), and the Iranian Ministry of

Information and Security.  The government of Iran uses Markazi to provide material support,

financial assistance, and other kinds of practical assistance, to Iran's Global Terror Network and

to facilitate acts of international terrorism.

30.     The Iranian government exercises tight control over Markazi and issues direct

orders to Markazi. Although Markazi's governor has a five-year term specified in the Iranian

Monetary Banking Law ("MBL"), in fact, he serves at the pleasure of Iran's president.  For

example, in 2008, the Markazi governor was dismissed by presidential decree when he refused to

resign.  Contrary to procedures set out in the MBL, the government cabinet regularly votes to

order Markazi to extend loans for specific political or ideological purposes.   From an economic

perspective, Markazi has less independence from the Iranian government than do the central

banks of most developed countries.

31.     Markazi directly participates in the Global Terror Network, which directly and

proximately caused injury to the Plaintiffs.  Markazi provided practical assistance to the Global

Terror Network by, among other things, facilitating the transfer of huge sums of Iranian state

funds to terrorist organizations.  Markazi also provided practical assistance to terrorist

organizations like the PIJ through the provision of banking or other financial transactions

involving various other Iranian agencies and instrumentalities and terrorist organizations. Markazi made its financial assistance available to the Global Terror Network for the specific purpose of facilitating terrorist attacks by, among others, the PIJ.

32.     The United States Department of Treasury has found that Markazi, among other state-owned Iranian banks, "willingly engage[s] in deceptive practices to disguise illicit conduct, evade international sanctions, and undermine the efforts of responsible regulatory agencies around the world."

33.     Markazi was, for a period of time, identified by the United States government as an SDN.  It has also been subjected to U.S. and European Union sanctions because of its knowing and intentional participation in illicit activity carried out by the government of Iran, its agencies and instrumentalities.  In addition, Bank Markazi's assets have been blocked in the United States since February 5, 2012, pursuant to Executive Order 13599, because of, among other things, its efforts to conceal transactions for the benefit of sanctioned parties and its facilitation of money laundering by sanctioned entities.

34.     The United States Department of Treasury Financial Crimes Enforcement Network has issued advisories that Markazi is integral to the Global Terror Network.

35.     For example, according to the United States Department of Treasury, between 2001 and 2006 more than $50 million dollars was transferred from Markazi, through Bank Saderat, to Beiruit for the benefit of front organizations that support the Global Terror Network.

### NITC Participated in Iran's Global Terror Network

36.     The government of Iran makes key decisions about NITC's operations.  Indeed, it is common knowledge in international markets that NITC has been controlled by the government of Iran since 1974.

37.     NITC is, and at all times relevant hereto was, at the service of the Supreme

Leader of Iran, the IRGC, and the Iranian Ministry of Information and Security.  NITC

participates in the Global Terror Network, which directly and proximately caused injury to the

Plaintiffs.

38.     NITC was, for a period of time, identified as an SDN.

39.     The government of Iran uses NITC to provide material support, transportation

services, logistical services, and other kinds of practical assistance, to Iran's Global Terror

Network and to facilitate acts of international terrorism carried out by the Global Terror

Network.

40.     NITC provided material support and practical assistance to the Global Terror

Network by, among other things, using its global shipping and business services to engage in

activities that support and further acts of international terrorism being carried out by Iran's

Global Terror Network.  NITC knowingly and intentionally participated in the Global Terror

Network for the specific purpose of facilitating terrorist attacks by, among others, the PIJ.

<u>NIOC's Participation in Iran's Global Terror Network</u>

41.     NIOC is, and at all times relevant hereto was, at the service of the Supreme

Leader of Iran, the IRGC and the Iranian Ministry of Information and Security, when it comes to

support of terrorism.  The United States has determined that, during the time periods relevant to

the allegations in this Complaint, the IRGC controls NIOC.  The IRGC is a Specially Designated

National as a result of its involvement in terrorism operations targeting U.S. citizens.

42.     NIOC generates substantial revenues for the government of Iran, the Iranian

Revolutionary Guard, and Iran's Global Terror Network.  Large amounts of cash have been

funneled *through* NIOC to terrorist organizations.

43.     The government of Iran uses NIOC to provide material support, transportation

services, logistical services, and other kinds of practical assistance, to Iran's Global Terror

Network and to facilitate acts of international terrorism carried out by the Global Terror Network.

44.     NIOC provided material support and practical assistance to the Global Terror Network by, among other things, providing large cash resources to support financially the Iranian Revolutionary Guard's efforts to carry out acts of international terrorism and using its oil and business services to engage in activities that support and further acts of international terrorism being carried out by Iran's Global Terror Network.  NIOC knowingly and intentionally participated in the Global Terror Network for the specific purpose of facilitating terrorist attacks by, among others, the PIJ.

45.     As a result of NIOC's material support for, and practical assistance to, the Global Terror Network, the United States identified NIOC as an SDN and imposed a variety of sanctions on it.

### NIGC's Participation in Iran's Global Terror Network

46.     Key decisions about the operation of NIGC are made by Iranian government officials.  NIGC was founded in 1965 as an entity wholly owned by the government of Iran.  In 2010, Iran's Oil Minister appointed a new regional director of NIGC, which means that NIGC was still under the control of the government of Iran.

47.     The government of Iran uses NIGC to provide material and financial support, money laundering services, and other kinds of practical assistance, to Iran's Global Terror Network for the purpose of facilitating acts of international terrorism.

48.     NIGC provided material support and practical assistance to the Global Terror Network by, among other things, using its business operations as a front to provide financial assistance to terrorist organizations, including the PIJ.  During periods of time relevant to this Complaint, NIGC used terrorist organizations as "go-betweens" for NIGC contracts and payment

arrangements and then paid those terrorist organizations "commissions" in order to launder money for those terrorist organizations.  NIGC engaged in this, and other activity, knowingly and intentionally to participate in Iran's Global Terror Network and to facilitate acts of international terrorism that kill or harm U.S. citizens, including terrorist attacks by the PIJ.

NIPC's Participation in Iran's Global Terror Network

49.     The government of Iran makes key decisions about NIPC's operations.

50.     The government of Iran uses NIPC to provide material and financial support, money laundering services, and other kinds of practical assistance, to Iran's Global Terror Network for the purpose of facilitating acts of international terrorism.

51.     NIPC was, for a period of time, identified as an SDN.

52.     NIPC provided material support and practical assistance to the Global Terror Network by, among other things, using its business operations as a front to provide financial assistance to terrorist organizations.  During periods of time relevant to this Complaint, NIPC used terrorist organizations as "go-betweens" for purported NIPC contracts and payment arrangements.  Pursuant to the NIPC contracts and payment arrangements, terrorist organizations received "commissions."  The NIPC contracts and payment arrangements were bogus business dealings intended to conceal the transfer of financial resources to the terrorist organizations, including the PIJ.  NIPC engaged in this, and other activity, knowingly and intentionally to support Iran's Global Terror Network and to facilitate acts of international terrorism that kill or harm U.S. citizens, including terrorist attacks by the PIJ.

53.     As a result of NIPC's provision of material support, financial resources, and practical assistance to terrorist organizations, the United States classified NIPC as a Specially Designated National and imposed a variety of sanctions on it.

Iran Air's Participation in Iran's Global Terror Network

54.     The government of Iran makes key decisions about Iran Air's operations.  The government of Iran uses Iran Air to provide material and logistical support, money laundering services, and other kinds of practical assistance, to Iran's Global Terror Network for the purpose of facilitating acts of international terrorism.

55.     Iran Air was, for a period of time, identified as an SDN.

56.     Iran Air provided material support and practical assistance to the Global Terror Network by, among other things, using its aircraft to transport terrorists for the purpose of enabling them to carry out acts of international terrorism.  Iran Air even makes flights and other special arrangements for individuals carrying out acts of international terrorism.  In addition, Iran Air has used its financial facilities to transfer cash to terrorists operating in foreign countries. Iran Air engaged in these, and other activities, knowingly and intentionally to support Iran's Global Terror Network and to facilitate acts of international terrorism that kill or harm U.S. citizens, including terrorist attacks by the PIJ.

<u>The Terrorist Attack</u>

57.     For several months prior to April 17, 2006, the PIJ planned, conspired and made preparations to murder and injure civilians by carrying out a suicide bombing in a crowded public location in Tel Aviv, Israel.

58.     Pursuant to the aforementioned plan, on April 17, 2006, at approximately 1:30 p.m., an agent and operative of the PIJ, Sami Salim Mohammed Hammed ("Hammed"), arrived at the Rosh Ha'ir restaurant near the old central bus station in Tel Aviv, which was packed with diners, in order to carry out the suicide bombing on behalf and at the direction of the PIJ.

59.     Hammed was carrying a powerful explosive device covered with nails and other metallic projectiles with which he had been provided by the PIJ for the specific purpose of

carrying out the bombing.

60.     Hammed set off the explosive device shortly after 1:30 p.m.  The explosion killed eleven people and wounded dozens of others.

61.     Among the wounded were Daniel Wultz and Yekutiel Wultz, who were visiting Israel for the Passover holiday.

62.     Daniel Wultz was critically injured in the bombing, and underwent multiple surgeries and other procedures to save his life, but succumbed to his injuries on May 14, 2006. Daniel Wultz was conscious immediately after the bombing and throughout much of his hospitalization.  Between the time of the bombing and his death, Daniel endured extreme conscious physical pain and suffering, as well as severe emotional pain as the result of his conscious awareness of both the fact and extent of his injuries, and the likelihood that he would die.

63.     Plaintiff Tuly Wultz suffered serious, enduring physical injuries in the bombing, as well as resultant psychological and emotional harm.

64.     Plaintiff Tuly Wultz was sitting next to his son Daniel at the time of the bombing. One moment Tuly and Daniel were enjoying a father-son lunch; the next moment Tuly saw his son Daniel on the ground, critically wounded and covered in blood.

65.     The Terrorist Attack was carried out in furtherance of the conspiracy between Iran and the PIJ using Iran's Global Terror Network.

66.     The PIJ carried out the Terrorist Attack utilizing funds, and other forms of material support and aid and assistance provided by Iran, including the Defendants, through the Global Terror Network.

Defendants' Property May Be Seized In Satisfaction of the Wultzes' Judgment.

67.     On August 22, 2008, the Plaintiffs filed a civil complaint in this Court against Iran and the Iranian Ministry of Information and Security for violations 28 U.S.C. § 1605A, *Wultz et al. v. Islamic Republic of Iran et al.*, Case No. 08-cv-1460 (RCL) [DE 1], arising from the horrific Terrorist Attack that targeted Daniel Wultz and Tuly Wultz.

68.     On February 27 and 29, 2012, the Court held a two-day evidentiary hearing during which it received evidence establishing that Iran and the Iranian Ministry of Information and Security provided material support for Terrorist Attack. Memorandum Opinion at 13-18.

69.     On May 14, 2012, this Court entered the Memorandum Opinion, finding that Iran provided "substantial logistical, financial, and technical support" to the PIJ in the period leading up to the Terrorist Attack.  Memorandum Opinion at 6.

70.     That same day, the Court entered judgment in favor of the Plaintiffs, awarding them compensatory damages in the amount of $32,068,634 and punitive damages in the amount of $300,000,000. Order and Judgment, dated May 14, 2012 [DE 133].

71.     On June 4, 2012, the Court entered the Judgment, which amended the May 14, 2012 judgment to more specifically identify each of the judgment debtors. Amended Judgment, dated June 4, 2012 [DE 137].

72.     28 U.S.C. § 1610(g)(1) provides, in pertinent part:

PROPERTY IN CERTAIN ACTIONS

the property of a foreign state against which a judgement is entered under § 1605A, and the property of an agency or instrumentality of such state, including property that is separate juridical entity, is subject to attachment in aid of execution and execution upon that judgment as provided in this section.

73.     Pursuant to § 1610(g), the Wultz Judgment may be enforced against any property of an "agency or instrumentality" of Iran, irrespective of whether the agency or instrumentality was specifically named a judgment debtor in the Wultz Judgment or whether it participated in

the Terrorist Attack.

74.      The Defendants named herein are liable to the Plaintiffs not only as

instrumentalities of Iran pursuant to 28 U.S.C. § 1610(g), but also as a result of their knowing

and intentional systematic participation in, and material support for, the acts of international

terrorism carried out by Iran's Global Terror Network, which directly and proximately caused

injury to the Wultz Plaintiffs.

## FIRST COUNT
(Declaratory Relief against Markazi)

75.      The preceding paragraphs are incorporated by reference as though fully set forth

herein.

76.      Pursuant to Iran's Monetary and Banking Law Article 10(e), Markazi is a joint

stock company.  All of its capital stock is wholly owned by the government of Iran.

77.      As a consequence, Markazi purports to have a separate legal existence from the

government of Iran, has a majority of its shares of stock or other ownership interest owned by the

government of Iran or a political subdivision thereof, engages in substantial commercial activity,

and is not a citizen of the United States or of any country other than Iran.

78.      Markazi is, therefore, an agency or instrumentality of Iran within the meaning of

28 U.S.C. § 1603(b) and § 1610(g).

79.      An actual controversy exists concerning the Plaintiffs' right to attach and execute

against property belonging to Markazi in satisfaction of the Wultz Judgment.

80.      Pursuant to 28 U.S.C. § 1610(g), as an agency or instrumentality of the

government of Iran, any and all property belonging to Markazi is subject to attachment and

execution in satisfaction of the Wultz Judgment to the extent that it is being used for commercial

or other non-governmental or non-public purposes.

81.     Pursuant to 28 U.S.C. § 2201, the Plaintiffs are entitled to a judgment declaring that they may satisfy the Wultz Judgment by attaching and executing against commercial or non-governmental or non-public property belonging to Markazi wherever such property may be found.

82.     Pursuant to 28 U.S.C. § 2202, the Plaintiffs are also entitled to further relief compelling Markazi to comply with the aforementioned declarations.

## SECOND COUNT
(Declaratory Relief against NITC)

83.     The preceding paragraphs are incorporated by reference as though fully set forth herein.

84.     NITC has a separate legal existence from the government of Iran, has a majority of its shares of stock or other ownership interest owned by the government of Iran or a political subdivision thereof, is predominately commercial in nature, and is not a citizen of the United States or of any country other than Iran.

85.     NITC is, therefore, an instrumentality of Iran within the meaning of 28 U.S.C. § 1603(b) and § 1610(g).

86.     An actual controversy exists concerning the Plaintiffs' right to attach and execute against property belonging to NITC in satisfaction of the Wultz Judgment.

87.     Pursuant to 28 U.S.C. § 1610(g), as an instrumentality of the government of Iran, any and all property belonging to NITC is subject to attachment and execution in satisfaction of the Wultz Judgment.

88.     Pursuant to 28 U.S.C. § 2201, the Plaintiffs are entitled to a judgment declaring

that they may satisfy the Wultz Judgment by attaching and executing against property belonging to NITC wherever it, or its assets, may be found.

89.     Pursuant to 28 U.S.C. § 2202, the Plaintiffs are also entitled to further relief compelling NITC to comply with the aforementioned declarations.

### THIRD COUNT
(Declaratory Relief against NIOC)

90.     The preceding paragraphs are incorporated by reference as though fully set forth herein.

91.     NIOC has a separate legal existence from the government of Iran, has a majority of its shares of stock or other ownership interest owned by the government of Iran or a political subdivision thereof, is predominately commercial in nature, and is not a citizen of the United States or of any country other than Iran.

92.     NIOC is, therefore, an instrumentality of Iran within the meaning of 28 U.S.C. § 1603(b) and § 1610(g).

93.     An actual controversy exists concerning the Plaintiffs' right to attach and execute against property belonging to NIOC in satisfaction of the Wultz Judgment.

94.     Pursuant to 28 U.S.C. § 1610(g), as an instrumentality of the government of Iran, any and all property belonging to NIOC is subject to attachment and execution in satisfaction of the Wultz Judgment.

95.     Pursuant to 28 U.S.C. § 2201, the Plaintiffs are entitled to a judgment declaring that they may satisfy the Wultz Judgment by attaching and executing against property belonging to NIOC wherever it, or its assets, may be found.

96.     Pursuant to 28 U.S.C. § 2202, the Plaintiffs are also entitled to further relief compelling NIOC to comply with the aforementioned declarations.

## FOURTH COUNT
### (Declaratory Relief against NIGC)

97.     The preceding paragraphs are incorporated by reference as though fully set forth herein.

98.     NIGC has a separate legal existence from the government of Iran, has a majority of its shares of stock or other ownership interest owned by the government of Iran or a political subdivision thereof, is predominately commercial in nature, and is not a citizen of the United States or of any country other than Iran.

99.     NIGC is, therefore, an instrumentality of Iran within the meaning of 28 U.S.C. § 1603(b) and § 1610(g).

100.     An actual controversy exists concerning the Plaintiffs' right to attach and execute against property belonging to NIGC in satisfaction of the Wultz Judgment.

101.     Pursuant to 28 U.S.C. § 1610(g), as an instrumentality of the government of Iran, any and all property belonging to NIGC is subject to attachment and execution in satisfaction of the Wultz Judgment.

102.     Pursuant to 28 U.S.C. § 2201, the Plaintiffs are entitled to a judgment declaring that they may satisfy the Wultz Judgment by attaching and executing against property belonging to NIGC wherever it, or its assets, may be found.

103.     Pursuant to 28 U.S.C. § 2202, the Plaintiffs are also entitled to further relief compelling NIGC to comply with the aforementioned declarations.

## FIFTHTH COUNT
### (Declaratory Relief against NIPC)

104.     The preceding paragraphs are incorporated by reference as though fully set forth herein.

105.    NIPC has a separate legal existence from the government of Iran, has a majority of its shares of stock or other ownership interest owned by the government of Iran or a political subdivision thereof, is predominately commercial in nature, and is not a citizen of the United States or of any country other than Iran.

106.    NIPC is, therefore, an instrumentality of Iran within the meaning of 28 U.S.C. § 1603(b) and § 1610(g).

107.    An actual controversy exists concerning the Plaintiffs' right to attach and execute against property belonging to NIPC in satisfaction of the Wultz Judgment.

108.    Pursuant to 28 U.S.C. § 1610(g), as an instrumentality of the government of Iran, any and all property belonging to NIPC is subject to attachment and execution in satisfaction of the Wultz Judgment.

109.    Pursuant to 28 U.S.C. § 2201, the Plaintiffs are entitled to a judgment declaring that they may satisfy the Wultz Judgment by attaching and executing against property belonging to NIPC wherever it, or its assets, may be found.

110.    Pursuant to 28 U.S.C. § 2202, the Plaintiffs are also entitled to further relief compelling NIPC to comply with the aforementioned declarations.

### SIXTH COUNT
(Declaratory Relief against Iran Air)

111.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

112.    Iran Air has a separate legal existence from the government of Iran, is predominantly commercial in nature, is not a citizen of the United States or of any country other than Iran, and has a majority of its shares of stock or other ownership interest owned by the government of Iran or a political subdivision thereof.

113.    An actual controversy exists concerning the Plaintiffs' right to attach and execute against property belonging to Iran Air in satisfaction of the Wultz Judgment.

114.    Iran Air is an instrumentality of Iran within the meaning of 28 U.S.C. § 1603(b) and § 1610(g).

115.    Pursuant to 28 U.S.C. § 1610(g), as an instrumentality of the government of Iran, any and all property belonging to Iran Air is subject to attachment and execution in satisfaction of the Wultz Judgment.

116.    Pursuant to 28 U.S.C. § 2201, the Plaintiffs are entitled to a judgment declaring that they may satisfy the Wultz Judgment by attaching and executing against property belonging to Iran Air wherever it, or its assets, may be found.

117.    Pursuant to 28 U.S.C. § 2202, the Plaintiffs are also entitled to further relief compelling Iran Air to comply with the aforementioned declarations.

**WHEREFORE** plaintiffs demand relief as follows:

1.    For a judgment declaring that the property belonging to any defendant named in this Complaint, no matter where such property is found, may be attached and executed on in satisfaction of the Wultz Judgment;

2.    For an award of reasonable attorneys' fees and costs of suit incurred herein; and

3.    For such other and further relief as the Court may deem appropriate.

November 28, 2017

Plaintiffs, by their attorneys,


/s/ Michael J. Gottlieb
Michael J. Gottlieb
BOIES SCHILLER FLXNER LLP
1401 New York Ave., N.W.
Washington, D.C. 20005
Phone: (202) 237-9617
Fax: (202) 237-6131
Email: mgottlieb@bsfllp.com

/s/ Lee S. Wolosky
Lee S. Wolosky
BOIES SCHILLER FLEXNER LLP
575 Lexington Avenue, 7th Floor
New York, NY 10022
Phone: (212) 446-2300
Fax: (212) 446-2350
Email: lwolosky@bsfllp.com

/s/ Douglass A. Mitchell
Douglass A. Mitchell
BOIES SCHILLER FLEXNER LLP
300 South Fourth Street, Suite 800
Las Vegas, Nevada 89101
Phone: (702) 382-7300
Fax: (702) 382-2755
Email: dmitchell@bsfllp.com